In this courtroom, by oral argument, we'll hear the first case and then take a recess to reconstitute the panel and then continue with the final three cases of the day. And we begin with AIG Specialty Insurance Company v. Tesoro Corporation. Ms. Ho. May it please the Court. The District Court reversibly erred by resolving two material fact disputes on summary judgment. First, when the Tesoro parties should have realized the insurance policy as written didn't cover Tesoro refining. And second, whether the contracting parties intended Tesoro refining to benefit from the policy. Just as a matter of common sense, it just seems difficult for me to understand how a sophisticated party would not have been able to look on the face of this policy and to see which parties are listed. Yes, Your Honor, and we certainly agree that this is an unusual situation in the sense that multiple sophisticated parties failed to appreciate the error in the policy as written. Not only Chartas and the Tesoro parties, but apparently Valero, Ultramar, the seller of the finery, Marsh, Tesoro's agent, and numerous employees at each of those companies. But three points. First, the unusual posture of the case itself suggests that it's difficult to resolve these issues on summary judgment. Reasonable individuals could react to the mutual ignorance between both sides, concluding that both behaved reasonably, neither behaved reasonably, one or the other. The room for such different reactions to the facts here is itself the fact question that we're entitled to argue to a jury. Second, both sides had serious financial incentives to discover the error, and neither did. And that suggests that the error simply was not obvious. Record testimony regarding Tesoro's corporate policy of procuring insurance in the parent company's name and insuring coverage for subsidiaries like Tesoro Refining later elsewhere in the policy, I think goes a long way toward answering Your Honor's question. In other words, the presence of Tesoro Petroleum Corporation as the name insured in the policy would not have alerted anyone that anything was amiss, because that was the company's policy of securing, and other companies as well. Ultramar did the same thing. One of the difficulties for me of deciding when the reformation cause of action accrues is that it's basically assuming the existence of a mutual mistake. And this might really be a follow-up to what Judge Smith just asked, but explain to me how there was a mutual mistake. I mean, there's clearly probably a mistake here, but how was there a mutual mistake when on May 16th, 2002, there's this letter saying an official request to assign the policy to Tesoro Petroleum Corp. That's exactly what the insurance company does. So I mean, I just don't see how there's a mistake on the insurance company's side of things. Certainly, Your Honor. And I think as an initial matter, I'd want to emphasize, as we do in our briefing, that our contention is that reasonable minds could differ on that point. In other words, this is a disputed fact issue that a jury ultimately should decide. But to your specific question in terms of what evidence in the record, what evidence can you point to is that, for me, I think the clearest or some of the most powerful evidence is the testimony of the insurer of Chartis's own underwriter, and this occurs in the record at 2857. And this is where Mr. Hubbard testifies, quote, I intended to assign the policy to the entity that was going to be responsible for the liabilities associated with the environmental assets. So the mutual intention, I think a reformation claim starts where the intent is the same. It's the drafting that's the problem, right? So the intent on all sides, and I think it's particularly clear in this testimony from the record, was to assign the policy to the entity that bore the responsibility for the environmental liabilities. That was the intent. The mistake was made when the policy, as it was reduced to writing, did not effectuate that intention. So one of the things that I have trouble with is you just admitted that they intended to and, in fact, did put the policy in the named insured being the parent. That's how they do it. So tell me exactly what would be reformed if we were to agree with you, this was go back to the district court, you were to win everything. What does a win look like in terms of reforming the policy, specifically what words are going to be changed? Certainly, Your Honor, and there are several ways that could be accomplished. No, I'm asking you. How are you reforming? This is a home run. You won. You rewrite it. Tell me how that is. What we asked for in the district court was for Tesoro Refining to be added to the policy as a named insured. Okay, so you are not just changing the name. You are adding an insured. So Tesoro Petroleum, the parent, would still have the insurance, but now Tesoro Refining would also have insurance. Precisely as in the Ultramar, the previous owner, that policy was issued to the parent corporation and was supposed to be also endorsed, or in the definition of named insured, the operating subsidiary was supposed to be included in the policy as originally issued, and Chartist has admitted that was the intent, but it made a mistake there in that scenario too. So essentially what we're asking for is for the policy to be reformed so that the policy as written extends coverage to Tesoro Refining, which the underwriter admits that was the intent of the underwriter. Okay. Let me ask you this. The mistake then in your view is not in the naming of Tesoro Petroleum, but in the failure to include Tesoro Refining as an additional insured or defining named insured to encompass Tesoro Refining as well. That's precisely right. Is that mistake inherently undiscoverable? I think the question for us is, are there disputed fact issues about when? Now, that's your question. My question I think is very clear. Is the absence of Tesoro Refining as an additional insured or as another named insured inherently undiscoverable? I think from this standpoint, I would say, I understand Your Honor's question, but I respectfully have to, I guess, preface my answer to it by saying that the cause of action for reformation in a sense presumes, I mean, Texas law presumes that parties read a document and thereby discover the mistake. That presumption can be rebutted under Texas limitations law by evidence showing that it was reasonable for a party in the position of the parties here not to have done so, not to have discovered, not to have discovered the mistake. And I appreciate that. The fact that you are not answering my question to me is the answer. It's not inherently undiscoverable, is it? Your Honor, I think in every reformation case, the answer to your question would be, no, it's not inherently indiscoverable if the policy is read. I think that would be true, Your Honor, in every reformation case. You're absolutely right on that. That's the issue in every reformation case. The issue is— Isn't this even a more difficult case for you than the deed in Cosgrove? Because deeds get recorded and they're put, registered with the county. Here, it's your client or its representatives telling the insurer who to add to the policies. I mean, it's not like a deed situation where someone might not actually look at the deed, and that's why you get into all this discussion they have of presumptions and everything else. Your Honor, I actually think that the aspect of Cosgrove you've highlighted is precisely why, if anything, I think it helps us rather than helps chart us. And that is, in a deed situation, deeds—the world is put on notice of what the deed contains, the world. So it would make little sense in a context where the world is presumed to know the contents of a deed to create some sort of exception that the parties themselves were somehow not on notice. So from my perspective, the fact that Cosgrove is a deed situation really shows how inapposite it is to the facts here. But the problem with that is that's true if you're talking about people who wouldn't otherwise have access to the deed. So if Judge Smith and I have a private contract, you have no way of knowing about it. If we filed it in the deed records, then the world would know. But here, we don't have any question that DeSoro had the policy. So this isn't some situation where they were told, yeah, the policy's fine, but never got a copy of it. They had a copy of it. They put it in their file, understand the argument, didn't look at it, all that. I get that. But I don't understand why the world knowing is some kind of distinction when there's no question DeSoro had the policy. It isn't a matter of can I go find out this information from public records, which is the deed situation. I have it in my records, sitting in my office. I just didn't look at it. That's your argument. Right. And I think that's why under Texas law, there are actually sort of two prongs for rebutting the presumption that you've read and are aware of the contents of a document. I think the first is what Your Honor referenced. I didn't read it. I just put it away. The second is, I think, the context here, which is relying on the insurer to carry out the insurer's function of accurately reducing to writing what the intent of the contracting parties actually was. Your Honor, if that answers your question. But see, the intent that you articulated was the intent to put it in the name of the person running the refinery. However, you now tell me actually the intent is to have two insureds, not just one. And that is a different intent. And so had Chartist been told there's going to be two insureds, but they receive only one name, I could see the argument, well, where's the second name? But they're told, we're going to send you the name. They get the name. They write the name down. So I don't understand what they didn't effectuate. They didn't go and explore the Tesoro corporate structure and all of this kind of stuff. And how is that on them when Tesoro is the people that set up this convoluted corporate structure? Two responses to that argument. I think, first, I have to resist lightly the premise. It was hotly debated below. And there are fact issues with respect to how exactly the mistake got made. There's no evidence in the record that the Tesoro parties instructed Chartist or its agencies to assign the policy to Tesoro Petroleum Corporation. It's not clear exactly how that mistake was made. I thought it was their broker. The broker used the words, this is your official record to assign to Tesoro. So I think it's ambiguous there. I think Valero, there's evidence that Valero actually was the party that made reference to Tesoro Petroleum Corporation. But that is a disputed fact issue. I think, to your point, the other testimony from Chartist's underwriter that I think is very relevant here is that they intended the Tesoro parties to have the same coverage that the previous owner, that Ultramar, had. It's different than what you said earlier, which is making sure that the people running the show have coverage. Now you're saying, well, it's making sure everybody in the Tesoro family has coverage, and that's a separate issue. I mean, it does expand the coverage. I mean, that's one of the things we're not talking about. Premiums are based upon who's being covered, what's being covered, whatever. When you suddenly are going to cover two different entities, the parent maybe for its knowledge and whatever, whatever, and then the subsidiary for its conduct or for being the owner or for whatever, that's a different analysis than just covering one or the other, right? I agree. And I think that is why the testimony that Chartist intended the same coverage that Ultramar had is important, because Ultramar was covered. Its parent corporation was the named insured, but the parties understood that the coverage was to the actual operating subsidiary. So that is precisely what the Tesoro parties thought they were getting, exactly what Ultramar had, which was naming the parent as the named insured and also covering. So the premium that was paid up front, just shy of a million dollars, was for precisely that structure, parent and operating subsidiary. That's exactly what we were intending to get coverage for. But your demand letters only listed the parent. Isn't that right? The demand letters did say, I think our formal coverage demand, which was on October 8, 2007, did make clear that it was Tesoro Refining that had purchased the refinery and that was the owner and operator of the refinery. So no, Your Honor. Our coverage letter, I think there are, I do think there are material fact issues on that point in terms of the actual letters tended to use Tesoro as a shorthand. Let me ask you, getting back to the inherently undiscoverable, because I haven't asked this, and that is we have these cases from 60s, 70s, 80s, 90s that talk about accrual being deferred until discovered, should have discovered, whatever. And then in 1996, we have the Altai case, we have SV versus RV, and the world changed and the Texas Supreme Court said it's got to be inherently undiscoverable and objectively verifiable. And that is what Cosgrove is riffing off of, in my view. It's not some brand new thing that happened in 2015. It's the extension of about 25 cases that say that. And so can we even really rely on some case from the 60s when we're talking about a sea change that occurred in 1996 that you all didn't discuss, but that nonetheless occurred? Yes, Your Honor, I do think so, and I think that is because, and I see my time is running, if I may answer your question. I do think that the difference between the discovery rule jurisprudence and the mutual mistake reformation jurisprudence is important in this regard. And again, I think notions such as inherently undiscoverable when you're talking about a written document, I think the ultimate end of your question, if that were right, would essentially do away with the cause of action for reformation altogether. And I don't think that can be right. So you'd have four years. You'd have four years. Four years is good enough for a lot of things. And so I don't know why it's not... Then I think it's the mutual mistake doctrine, I think, that would be the casualty of that approach. And I don't think the Texas courts intended in their jurisprudence on the discovery rule to sub salientio do away with that separate body of jurisprudence, which I will agree with you is related, but I think distinctly different, particularly in this context. And I'll reserve the rest of my time for rebuttal. Yes, you've saved time for rebuttal, so thank you. Thank you. Mr. Davis. Good morning, and may it please the Court. Before I begin, I'd like to correct the record. The July 2007 letter about which you inquired Judge Smith, Ms. Ho suggested reference to Soro refining. It does not. That's at the... Well, actually, I was looking at your brief on page 24 discussing the October 2010 letters. The October 2010 letter also does not discuss Soro refining. To the contrary, the October 2010 letter specifically says that the Soro Petroleum Corporation is the entity demanding coverage. The initial notice letter that Ms. Ho was referencing in 2007, which is a record of Appeal 5885, identifies the insured as Soro Petroleum Corporation, defines the word Soro as Soro Petroleum Corporation, and provides notice of the policy under Endorsement 12, which added to Soro Petroleum Corporation. And that fundamentally presents the question this case raises regarding reformation, which is whether, under Texas law, a plainly evident omission in an unambiguous insurance policy delivered to an insured represented by its own insurance broker can invoke the discovery rule when both parties actually... Well, she's basically conceded that the discovery rule doesn't apply, which she has to, because, again, I mean, you also basically acted like the Cosgrove was some brand-new thing, whereas Altai was 20 years before that. The fact is that's been the law for 20 years. It has to be inherently undiscoverable for the discovery rule to apply, absent a statutory discovery rule, which would be a different category that we don't have here. So, to me, that alters this whole old line of cases that you all are relying on or discussing. She says it doesn't because reformation is just different. We don't really follow the construct of the discovery rule. We follow something else, some amorphous something else. So I'm not sure I understand that, but go ahead and address that, because I think she's basically conceded the discovery rule doesn't apply. But what she's saying is when you have a mutual mistake, we're not really talking about discovery rule. We're talking about something else. But there is nothing else. The discovery rule is the issue. And if the discovery rule does not apply, then the reformation claim is time-barred. And, Judge Haynes, I would agree with you. But what do you do with her argument? Well, the problem with that is then we're not going to really have reformation for mutual mistake. Well, of course you will. You'll have a four-year statute of limitations. And more, if you carefully examine Cosgrove, you are correct. What it did was clarify, as I believe the Texas Supreme Court stated, what it had suggested in an entire line of previous cases and announced it as a bright-line test, which was simply this. In a plain omission case, in an unambiguous document, the discovery rule shall not be applied. That's the ruling in Cosgrove. It's controlling here. It did merely clarify the case law that had been accumulating in Texas for more than 20 years. And, in fact, it was interesting. In the reply brief, the only distinction that Tesoro drew regarding Cosgrove was to suggest that Cosgrove, in every single case it cited, and they say this, were limited to deeds as a matter of public policy. That's just false. Cosgrove drew from a long series of cases. It involved two issues. One was the application of the discovery rule. The other was the effect of Section 13.002 of the Texas Property Code. That second question, that latter question, necessarily was limited in its scope to deeds. But the discussion of the discovery rule drew from discovery rule jurisprudence, which is not particular to any cause of action. Quite to the contrary, all the cases say the issue is one of law to determine whether in an exceptional case the discovery rule shall be applied to toll a variety of different limitations. What's the rule for accrual of a reformation claim? Because first you determine when a cause of action accrues. Then you see whether the plaintiff can invoke the discovery rule. So what's the accrual rule for reformation? The accrual rule for reformation is when there is a plain omission in an unambiguous document, then the discovery rule does not apply and the statute of limitations will begin to accrue at the time the party receives the document, which is with the case here. It's unambiguous. In Cosgrove, the court specifically— The clock starts ticking when the insurance policy is reviewed with the alleged mistake? That's correct. The court in Cosgrove said, quote, in cases like these which involve an unambiguous deed, the conspicuousness of the mistake shatters any argument to the contrary. And if we substitute policy for deed, the conclusion is unmistakable, which is why Tesoro tried to limit its scope. But the point I was going to make in response to Judge Haynes's inquiry is if you look at the cases that Cosgrove cites— and we didn't get a survey reply, so we didn't get the opportunity to draw the court's attention to this— but there are six cases which it cites in support of its discussion of the discovery rule. Two of those are medical malpractice cases. Two of those involve oil and gas royalties. One of them is a misappropriation of trade secrets case. And one of them involves a claim involving an additional named insured under an insurance policy. Vionette. Vionette. And the Vionette decision is particularly instructive. That case, by the way, was a continuation of a dispute that this court decided in which Judge Smith wrote the opinion in Tigg v. Sedgwick James where the court wrote an opinion rejecting a reformation claim to add an additional named insured despite the existence of a certificate of insurance that was issued by a soliciting agent for the carrier. That's a far more compelling set of circumstances than we have here. So is Vionette. And Vionette in particular. Vionette was the follow-up. It was a breach of contract case, not a reformation claim, but it was a breach of contract case against the entity which failed to procure the additional insured coverage after the claim was lost against the carrier itself in the Sedgwick James suit. The court in Vionette said, First, we have restricted the discovery rule to exceptional cases to avoid defeating the purposes behind the limitation statute. Second, they found specifically that the failure to add a third party as an additional insured is objectively verifiable and not inherently undiscoverable. And, of course, that's just common sense. You read the name on the policy, and it indicates who's covered. A party who isn't listed, it's obvious. It was obvious here. If your legal position is correct here, that yields a huge windfall, does it not? No more so than in any other statute of limitations case. The equities in each individual case involving the application of the statute of limitations are always harsh. But from a public policy perspective, the Texas Supreme Court has made clear that the equities in favor of finality and in favor of enforcing limitations rather than creating exceptions to them are controlling. I mean, we apply limitations to wrongful death. That's correct. Which is far harsher. That's correct. And the equities, for example, in the Harbor Insurance case, which this court also decided and which is also relevant here, were actually, again, far more compelling. There was an acknowledged mistake. Let me ask you about that. I'm trying to see if there's any way to harmonize the old cases without simply saying that the 1996 Altai et sec and progeny or whatever changed the world. I wonder if the harmony is this. What Harbor, in part, although it was also dealing with limitations, and the preceding cases we're dealing with, was whether you could have a claim for reformation at all. Because the presumption is I get the policy, I should have read it, and having read it, I ratified it by not immediately calling up and going, hey, hey, where's disorder refining? So whether I could have a reformation claim at all is what all these rebuttable presumptions and all this stuff are talking about. On the other hand, when does limitations accrue? When can I sue? When can I sue is a different question that the discovery rule either answers or doesn't. In other words, it either applies or doesn't. So if I get the policy and I put it in my file and I don't read it, I haven't ratified it if I'm tosoro. And three years later I can go, oops, oh, my gosh, refining's not in here and sue, and I'm not barred by my failure to have read it earlier. However, if I wait longer than four years, I'm barred by limitations. Not barred by failure to read and ratification, but barred by limitations. Is that a harmonizing approach or not? It is a harmonizing approach, and with one slight modification I would agree with you. This court has actually previously recognized the limited scope of the Boyle case and the Taylor case on which tosoro has relied. In materials evaluation this court said these cases are distinguishable from the present matter because they involve the insured not examining the policy on the basis that the policies were intended to protect the insured from the covered risk based on prior communications. And in each of those as well, the insured was not represented by a broker. Since 1967, Texas law has been clear, when you have a broker who is charged with the responsibility of procuring insurance, the broker's knowledge is imputed to you. The broker either reads the policy and that knowledge is imputed or the broker fails to read the policy and the negligence is made. But all of that still deals with ratification. It still deals with, I mean, in the circumstance where I knowingly get a policy that only insures me and not my husband, I can't change my mind later. I knowingly did that. I'm barred whether I sue within four years or not. That to me is the merits of a ratification argument. This is a separate question. This is on three years and 364 days you had a cause of action, four years and one day you didn't. That's limitations. And I don't see anything that you just said as changing that. No, from a factual perspective, it does not. But the tweak that I was suggesting earlier is actually on a legal basis, and it's going back again to the third point which the Vionette Court made, and it's the proposition for which Vionette was cited by the Cosgrove Court, which was that the court found in determining the discoverability of the additional insured in that instance, the question is a legal question. It's not a factual question. Whether or not you get to rebut is a legal question decided on a categorical rather than a case-specific basis. The focus is on whether a type of injury rather than the particular injury was discoverable. That's a discovery rule analysis. Inherently undiscoverable is a discovery rule analysis. The question of whether I can ever bring a reformation claim, ever, within four years or after four years, is a ratification question. That's what those old cases are talking about. By getting the policy, am I deemed to have ratified it if I didn't immediately call up and go... For example, when you're negotiating a settlement with the opposing counsel and they send you something where they added in something that you didn't agree to, you get on the phone immediately and you go, wait a minute, what's this extra sentence that I'm releasing something I didn't say I was releasing? As opposed to just sticking it in a file, right? The question is whether the failure to do that would completely bar a reformation claim at all. That, to me, is a separate question from accrual, discovery rule, four years later, ten years later, whatever. And that's what I'm drawing the distinction of. These old cases are largely dealing, although they overlap some with limitations, they're largely dealing with the question of whether you have a cause of action at all for reformation, having failed to jump up and down the day you got the policy. I would agree. And further, I would say that in regard to those cases, each of them originating with Boyle and the handful of cases which have ever addressed that issue, all involve circumstances into which, as you suggest, Judge Haines, the insured met the burden of proving that it never read the policy, that it did as you did and stuck the policy in the drawer. That isn't the case here. It's undisputed that DeSoro received these policies. It's undisputed that they read them. It's undisputed that they were part of a billion-dollar transaction, $1 billion. That was regulated by the Federal Trade Commission. It's undisputed that the policy was an exhibit to the purchase and sale agreement for this refinery. And it is unimaginable that, setting aside Marsh, that Fulbright and Jaworski committed malpractice by not reading a policy which it attached as an exhibit in a billion-dollar deal. I hope it's unimaginable. Yes, I'm sure they would. And, indeed, it is unimaginable. And the record is clear, the parties did receive this. DeSoro saw the policy. They read it. Mr. Hafner, who's here today, testified that they had an understanding of what was important to them at the time they did the acquisition. All right, so why don't you address, we really haven't talked about the third-party beneficiary, because if that argument is good, then all this limitations, ratification, yadda yadda, doesn't matter. Third-party beneficiary is determined by conflicts of law. It's a case-determinative issue. Texas law should clearly apply to the contract formation issues at issue here. DeSoro's tried to cloud that issue a little bit by citing to you in the record... So if California law applies, you lose? No, not at all. I'll address that in a moment. But if Texas law does apply, DeSoro concedes that it loses. And the question is whether or not you do a standard analysis under the restatement. DeSoro argues that Section 193, which says that, generally speaking, the insurance policy is governed by the law of where the insured risk is located, controls in every case. They argue that you shouldn't apply Comment D, which provides for an exception, or Section 188, which provides for a general analysis, because if you did so, the exceptions would consume the rule. That's clearly not true. As the restatement itself notes, in the overwhelming majority of cases, the insured risk is going to be located in the same jurisdiction in which the policy was issued. Here, that was not the case. And the courts that have applied this, for example, in the Boardman case, have found that you look to Section 1... I'm sorry, the Broadhead decision. You look to Section 188 and do an analysis of which state has the greatest interest. If you carefully examine the record, the record citations DeSoro has provided you to suggest that it wasn't in Texas, they're either not true or they're not part of the summary judgment record below. The reality is this was a policy issue as a result of negotiations between the Texas offices of AIG and of March, and they involved not one, not two, but three insureds located in the state of Texas. DeSoro, Ultramar Diamond Shamrock, and Valero, which had acquired Ultramar by the time of the issuance of these endorsements. Texas law is the greatest interest regarding the identity of the parties to a contract negotiated in Texas involving Texas domiciled corporations, and Texas law controls the contract formation issues here. If Texas law governs, it's an easy decision. DeSoro has admitted it loses. But it loses also under California law. The essence of DeSoro's argument on appeal is that the court failed to consider extrinsic evidence as California law permits, not to add to, vary, or detract from the terms of a contract, but to understand them. It's very California rule. You can look to extrinsic evidence to understand the context in which a contract was made, but you can't add to it. And in fact... You're saying what Ms. Ho just told us about adding another insured is adding to it even if we're California dreaming. That's correct, and the Ninth Circuit specifically addressed that in the Bonaparte decision, which we cited to you, where they found that even under California law, an insurance contract is personal and provides protection only for the named insured, not for a general class of actual owners, as Ms. Ho has suggested. And the American Home case below, on which the trial court relied, is a very similar situation. And Tesoro's attempted to distinguish that case by claiming that the entity which wished to be added as an additional insured was merely a passive parent. It wasn't. It was the actual lessee of the property. And the policy in that case provided coverage, identified the property as the portion of the real property leased by... Isn't there the other way around, that Tesoro Refining had been listed, and they're the owner, and blah, blah, blah, and then now somebody sues both of them, Tesoro Refining and Tesoro Petroleum, and Tesoro Petroleum goes, Look, I should get coverage, too, because I'm just kind of here along for the ride. Would that be a closer case under California law? No, I don't believe so, because, again, the identity of... The coverage is personal to the named insured under California law. And California law could not... You can't rely on extrinsic evidence to add a new party. There are no cases in which that has occurred. What about their argument that you don't read an insurance policy in a way that would effectively preclude any coverage and that the parent corporation that is listed isn't really going to have any environmental liabilities, yet they're paying all this money in premiums? Well, the trial court specifically addressed that. And at the hearing below, Tesoro conceded that it had coverage under this policy. And as the trial court noted, the Tesoro parties may have not received the benefit which they anticipated, but they acknowledged that they received the benefit, and, in fact, they did. The question of illusory coverage is whether there can be coverage under any set of circumstances. Here there clearly was. The Tesoro Petroleum Corporation could, for example, have been sued, joined in a suit by a third party. Their coverage is under C, D, and E, I believe. We would have been obligated to defend those claims. Coverage is also provided under this policy to Valero as an additional named insurer. The fact that this claim isn't covered does not render the policy illusory. The question is whether there is any claim under which coverage could be provided. And Tesoro conceded below, and the trial court noted in his opinion that that was true, that they did have coverage. There is no illusory coverage here. The court found, considered the extrinsic evidence, which Ms. Ho suggested he did not, and he found that the evidence is characterized by and in the light most favorable to the Tesoro parties demonstrates that the Tesoro parties intended that Tesoro refining be a named beneficiary of the policy, not a third-party beneficiary, and that's the essence of the problem. They don't really have a third-party beneficiary claim. They're seeking reformation, and a reformation claim, however it's characterized, is governed by the applicable statute of limitations as this court found in Harbor Insurance in a very similar scenario. Our time has expired, Mr. Davis. Thank you. Ms. Ho, you've saved time for rebuttal. Three brief points. First, in response to the line of questionings about the third-party beneficiary claim, that is an alternative basis for reversal. We do believe California law applies substantively for the reasons we've set out in our briefing and that, at the least, there are material fact issues about the intent of the parties there. How do you respond to the argument that you just can't go around adding insureds under some sort of third-party beneficiary argument, even in California? I think the question under California law, and I liked Your Honor's articulation of it as California dreaming. I mean, California law is very different from Texas law on this point, in that it really is whatever, even something that looks clear, is not. And the primary thing is to consider what the intent of the parties was here. And I think that the testimony that we talked about earlier... It's just a little weird to me to layer intended beneficiary law onto an insurance policy that the whole point is, like, who's insured. I agree. I think what we're trying to get at here, and I think at this point, at summary judgment, we have two theories. I think which one ultimately would be more viable is, again, a matter for a jury to decide, and that's our primary contention today. But I do think those two claims really are getting at what was the intent of the parties? What was the intent of the parties? And for the Reformation claim, that claim is that the writing did not effectuate those intentions. I think the heart of the third-party beneficiary claim is similar in that what you're wanting is... You're getting at the intent of the parties. I think California law is simply much more liberal than Texas law in two respects. Number one, in not just allowing but requiring courts to look at extrinsic evidence, which, respectfully, I don't believe the district court did here. And second of all, that the third party does not need to be, as it does in Texas law, explicitly spelled out. So, again, our primary contention is there are at the least material fact issues on the third-party beneficiary claim that preclude summary judgment at this stage. And also, just to be clear, on the Reformation claim, my argument is not that the discovery rule doesn't apply here. It's that in the body of mutual mistake law, there are two ways that one can show that it was reasonable for the party not to have discovered the mistake. Again, one is exactly what Your Honor said, Judge Haines, which was putting away the policy without looking at it. The second way, under Texas law, that is still good law, has never been overruled by any other Texas case, so far as we're aware, is reliance on the insurer to effectuate the intents of the parties. And what was the evidence of that reliance? Well, I think the evidence of that was we assumed that Chartist... Can you point me to a record site of somebody that gives me that evidence? ...of the reliance on Chartist to effectuate this rather than the broker, rather than themselves, rather than Valero, but that Chartist... I see your question, and I think this would be an area on which we would agree it's a material fact issue. We would point to evidence in our demand letter in the conversations with the parties on the past conduct that shows that we did rely on our agent. Chartist obviously disagrees with that version of... Help me out. Let me get a minute this way. I'm looking for contemporaneous evidence. So back in 2002, or whenever this happened, 2002, what evidence can you point to now from 2002 that Tesoro Refining is relying on Chartist? Well, we're relying on the insurer to effectuate our intentions, and I think we would rely... But I'm saying evidence in the record that shows me that, not just your representation, which I appreciate, and I understand your argument, but I'm looking for record evidence to prove this point that you say is so critical. I understand, Your Honor. I would say the evidence of that would be, first of all, the testimony of Chartist's underwriter with what the intent of Chartist was in terms of what they were trying to do with assigning the policy, to cover the entity that was responsible for the liabilities, and I think this is critical, to give us what Ultramar had. And there's reams of evidence in the record to that respect. Yes, Your Honor. Tesoro's reliance. Not Chartist trying to do the right thing, messing it up, but Tesoro's reliance on Chartist to the extent that they aren't going to do their own due diligence. They're going to rely on Chartist. Where's that evidence? I think that, Your Honor, is in the e-mails between, and we've cited several of these in our brief, the e-mails between the parties of what Chartist was wanting. Excuse me, I misspoke. What Tesoro was wanting. In other words, the same coverage that Ultramar had. I think it's inherent in that, that we were relying on Chartist. Chartist was the one who was writing the policy. Chartist was the one who was making the assignment. I think that's undisputed. And so I think that the e-mails, the discussions, all of that, I think, is evidence that, of course, we were relying on Chartist. In other words, we weren't sending them, say, drafts of things to include. We weren't sending them drafts. We were relying on Chartist as that e-mail conversation shows. And I see that I'm out of time. May I finish? In other words, I think the point of the exception is that in this situation, and I don't disagree that this is a very unique situation, we had no choice but to rely on Chartist to assign to us what Ultramar had, which was what we wanted and what Chartist wanted. And our primary contention is that material fact issues precluded summary judgment at this point in terms of whether the written policy actually affected those intentions or not. All right. Thank you, Ms. Owey. Your case is under submission, and the Court will take a recess.